ORIGINAL

FILED IN CLERK'S OFFICE
USDC Atlanta

JAN 22 2007

JAMES N. HATTEN, Clerk
By: [signature] Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**THE NORTHERN DISTRICT OF GEORGIA**
**ROME DIVISION**

| | |
|---|---|
| **ELIZABETH MORRIS, individually and as Next of Kin to Mario Williams; and Angelique Heard, minors; MARIO WILLIAMS, ANGELIQUE HEARD, minors,** | |
| **Plaintiffs,** | |
| | **CIVIL ACTION** |
| **vs.** | **FILE NO. 1 07 CV 0162** |
| | **ODE** |
| **DOUGLAS COUNTY BOARD OF EDUCATION OR DOUGLAS COUNTY SCHOOL SYSTEM; DONALD REMILLARD, individually and in his official capacity as Superintendent of Schools; GEORGE CHIP, individually and in his official capacity as Assistant Principal; MONTY FOUNTAIN, individually and in his official capacity as Physical Education Instructor; CHRISTY CLARK, individually and in her official capacity as School Resource Officer,** | |
| **Defendants.** | |

**COMPLAINT FOR CIVIL RIGHTS VIOLATIONS**

COMES NOW, Elizabeth Morris and Mario Williams, Plaintiffs, who hereby file this complaint in tort for damages and shows the Court the following:

## JURISDICTION

1.

Jurisdiction is conferred upon this Court by 28 U.S.C. §§1332 and 1367, 42 1983, 42 U.S.C. §§ 1985(3) and pursuant to those rights, privileges and immunities as secured by the Fourth and Fourteenth Amendment to the United States Constitution, and Assault and Battery, Intentional Infliction of Emotional Distress, as secured under Article I. §I of the Georgia Constitution (pendent jurisdiction).

2.

The Defendants' action as complained of herein occurred in Douglas County, therefore, venue is proper in this Court.

3.

Plaintiff, Elizabeth Morris, is a resident of Douglas County, Georgia.

4.

Plaintiff, Mario Williams, is a resident of Douglas County, Georgia.

5.

Plaintiff, Angelique Heard, is a resident of Douglas County, Georgia.

6.

Defendant, Douglas County Board of Education or Douglas County School System, may be served through the Douglas County Commissioners' Chairman, Tom Worthan, 8700 Hospital Drive, Douglasville, Georgia 30134.

7.

During the period giving rise to this lawsuit, Defendant, Don Remillard, was acting individually and in his official capacity, as an agent for Douglas County Board of Education or Douglas County School System, and is subject to the jurisdiction of this Court.

8.

Donald Remillard, may be served at Douglas County Board of Education, 9030 Hwy. 5, Douglasville, Georgia 30134.

9.

During the period giving rise to this lawsuit, Defendant, George Chip, was acting individually and in his official capacity, as an agent for Douglas County Board of Education or Douglas County School System, and is subject to the jurisdiction of this Court.

10.

George Chip, may be served at Douglas County Board of Education, 9030 Hwy. 5, Douglasville, Georgia 30134.

11.

During the period giving rise to this lawsuit, Defendant, Monty Fountain, was acting individually and in his official capacity, as an agent for Douglas County

Board of Education or Douglas County School System, and is subject to the jurisdiction of this Court.

12.

Monty Fountain, may be served at Douglas County Board of Education, 9030 Hwy. 5, Douglasville, Georgia 30134.

13.

During the period giving rise to this lawsuit, Defendant, Deputy Christy Clark, was acting individually, as an agent for Douglas County Board of Education or Douglas County School System, and is subject to the jurisdiction of this Court.

14.

Deputy Christy Clark, may be served at the Douglas County Sheriff's Department, 6856 Broad Street, Douglasville, Georgia 30134.

15.

All the above defendants were acting jointly and separately in the discharge of their duties and with the express authority of Douglas County Board of Education or Douglas County School System.

**FACTUAL ALLEGATIONS**

16.

At the time of the events giving rise to this lawsuit, Mario Williams, hereinafter, "Mario", was a student at Fairplay Middle School and Alexander High School, hereinafter AHS.

17.

Plaintiff, Elizabeth Morris, hereinafter, "Ms. Morris", is Mario's and Angelique's grandmother and custodian.

18.

During the school year 2004, Mario was a seventh grade student, attending Fairplay Middle School.

19.

Between April and May, 2005, Mario incurred approximately five (5) absences

20.

Ms. Morris provided Fairplay Middle School with an explanation and excuse for Mario's absenteeism.

21.

During the summer of 2005, Douglas County Juvenile Court called Mario and Ms. Morris to Court and inquired about Mario's absences.

22.

At that time, Ms. Morris also provided Douglas County Juvenile Court with an explanation and excuse for Mario's absences.

23.

In August 2005, School Resource Officer (SRO) Douglas County Deputy, Chiquita Batey, informed Ms. Morris that Mario had an "absenteeism paper trail" and a warrant was issued against him.

24.

In August 2005, Mario returned to Georgia from New York and went to the Douglas County Juvenile Court on the following morning.

25.

The Court advised Ms. Morris that Judge Peggy Walker could not hear Mario's case that day and instructed her to take Mario back to school and return to Court the following Monday.

26.

When Plaintiffs arrived at AHS on the following Monday, Ms. Morris talked to the Assistant Principal, Diane Matthews, in Ms. Matthew's office.

27.

As Ms. Morris and Ms. Matthews talked, Deputy Batey entered the office and asked Ms. Morris if she knew that Mario had been charged with truancy.

28.

Ms. Morris explained that she provided Douglas County Juvenile Court with an explanation and excuse for Mario's absences.

29.

Deputy Batey called the Douglas County Juvenile Court, at which time the Court ordered Deputy Batey to bring Mario to Court, immediately.

30.

Deputy Batey transported Mario to the Court.

31.

When Mario arrived, a different Douglas County Deputy handcuffed and shackled Mario.

32.

Mario was detained in the holding cell for 4 hours.

33.

After the 4 hour period expired, Mario appeared before Judge Walker;

34.

Judge Walker released Mario to return to school.

35.

Mario graduated from Fairplay Middle School and started attending Alexander High School (AHS) in August 2006.

36.

Almost immediately after Mario started attending AHS, members of the staff had labeled Mario as a troubled kid and started to harass him.

37.

For example, Mario's physical education instructor, Monty Fountain, hereinafter, "Mr. Fountain," instructed Mario to lift weights beyond his capacity and called Mario a sissy, in front of the class, because Mario could not lift the weights.

38.

In another instance, Mr. Fountain asked for volunteers to demonstrate a way to do a formation to lift weights, without weights, and when Mario volunteered, Mr. Fountain told Mario, in front of his classmates and in a negative way, "No, I don't want you."

39.

Mr. Fountain embarrassed and humiliated Mario.

40.

AHS scheduled Mario for two physical education classes, during the same term.

41.

Mario complained to Mr. Fountain about having to take two physical education classes during the same term.

42.

Mr. Fountain failed to remove one of the physical education classes from Mario's curriculum.

43.

Consequently, Assistant Principal, Stephen Batey, removed one of the classes from Mario's curriculum.

44.

Mario suffered seizure like activity and was on medication that made him drowsy.

45.

Ms. Morris advised the school, Guidance Counselor, Sophia Wright, that Mario took the medication and that it caused him drowsiness.

46.

On numerous occasions, Mario experienced the seizure like activity and skipped Mr. Fountain's class, as a result.

47.

Between August 2006 and September 2006, Mr. Fountain did not permit Mario to call home after Mario informed Mr. Fountain that he was ill.

48.

In August 2006, Mr. Fountain did not permit Mario to call home when he was ill.

49.

Mr. Fountain required that Mario remain in school the entire period.

50.

After Mario finished school, he went to the doctor, the same day.

51.

The doctor diagnosed Mario with pneumonia.

52.

The following morning, Ms. Morris called AHS Assistant Principal, George Chip, hereinafter, "Mr. Chip", to complain about Mr. Fountain's combative attitude against Mario, including his failure to permit Mario to call home when he was ill.

53.

At that time, Ms. Morris requested that Mr. Chip schedule an appointment for them to talk.

54.

Also, Ms. Morris threatened to file charges against Mr. Fountain.

55.

Mr. Chip asked Ms. Morris not to file charges until after he arranged a meeting and they talked.

56.

Mr. Chip never arranged a meeting.

57.

Approximately one week later, Ms. Morris went to AHS and asked Mr. Chip why he hadn't scheduled a meeting.

58.

Mr. Chip told Ms. Morris that the Guidance Counselor had been busy.

59.

After Ms. Morris continued to insist that Mr. Chip schedule a meeting, Mr. Chip walked Ms. Morris to the office of the Guidance Counselor to schedule a meeting between Ms. Morris, Mr. Chip and Mario's other teachers.

60.

The office personnel obtain information from Ms. Morris and told her they would call her.

61.

No one ever called Ms. Morris.

62.

In September 2006, Mr. Fountain, called Ms. Morris and told her Mario was having problems with his class.

63.

At that time, Ms. Morris told Mr. Fountain that she had been trying to contact him for some time to discuss his negative attitude towards Mario.

64.

Ms. Morris also told Mr. Fountain that she needed to schedule a meeting as soon as possible.

65.

At that time, Ms. Morris told Fountain that she had a problem with Mr. Fountain not permitting Mario to call home.

66.

Ms. Morris also expressed to Fountain that she believed he was harassing Mario.

67.

Mr. Fountain responded that Ms. Morris needed to set up a meeting with the guidance counselor.

68.

On the same day, Ms. Morris met with Ms. Wright and scheduled an appointment to meet with Mr. Chip, Mr. Fountain and Mario's other teachers.

69.

Several weeks later, Ms. Morris met with Assistant Principal, Rob Alford and Mario's math and science teachers.

70.

Mr. Chip was not present at the meeting.

71.

Mr. Alford did not address the issues of Ms. Morris's and Mario's concern.

72.

Sometime thereafter, Mr. Chip called Mario into his office for, reportedly, violating the dress code.

73.

Mr. Chip accused Mario of wearing a hooded jacket, suggesting that he was in a gang.

74.

Consequently, Mr. Chip had Mario searched in his office.

75.

Mario did not violate the dress code.

76.

When Ms. Morris arrived at the school, the School Resource Officer, Deputy Christy Clark, hereinafter, "Deputy Clark", told Ms. Morris that Mario was seen on the internet with a gang, toting a gun.

77.

Ms. Morris fiancée, Stevie Hunt, responded that Mario is a good kid, has strict supervision and has accomplished exemplary as an athlete at AHS, having won a trophy for Best Player in the 2006 football league.

78.

Ms. Morris asked Mr. Chip and Deputy Clark to show her the pictures on the internet.

79.

Deputy Clark downloaded the picture; however, Mario was not in the picture.

80.

Prior to the time Ms. Morris arrived at the school, Mr. Chip and Deputy Batey insisted that Mario was in a gang.

81.

At that time, Mr. Chip asked Mario, several times, "What gang are you in?"

82.

On or about October 30, 2006, Mr. Fountain put Mario on In School Suspension (ISS) because Mario checked out of school early.

83.

Mario checked out of school for a doctor's appointment.

84.

Prior to the time Mario checked out of school, Ms. Morris called the attendance office and informed the staff member present that Mario would be checking out of school early because he had a doctor's appointment.

85.

Mr. Fountain was aware that Mario had authorization to check out of school early.

86.

In August or September 2006, a group of boys attempted to jump on Mario while he was at a football game at AHS.

87.

Ms. Morris reported the above incident to Mr. Chip.

88.

Instead of showing concern, Mr. Chip, in an accusatory nature, asked Ms. Morris, "What was he (Mario) doing there?"

89.

On or about October 31, 2006, again, a group of boys attempted to jump on Mario.

90.

Ms. Morris called the Douglas County Sheriff's Department to report the incident.

91.

Douglas County Deputy Thomas Puckett took down Ms. Morris's complaint.

92.

On the following day, Ms. Morris went to AHS and reported the incident to Mr. Chip and Deputy Clark.

93.

After Ms. Morris made the report, she left the school.

94.

Feeling uneasy about the lackadaisical attitude of Mr. Chip and Deputy Clark, Ms. Morris returned to the school, with the intent of removing Mario and her other grandchildren, Teneisha, Armond and Quentin, from AHS.[1]

95.

When Ms. Morris returned to the school, Teneisha, Armond and Quentin were in Mr. Chip's office.

96.

Mr. Chip was questioning the children.

97.

At that time, Mr. Chip informed Ms. Morris that he was suspending Mario and Armond for five (5) days.

98.

At that time, Ms. Morris asked Mr. Chip for a withdrawal slip to remove the children from school so that she could enter them into another school.

99.

Mr. Chip responded that the kids would not be able to get into another school in Georgia.

[1]Ms. Morris is the custodian of Teneisha, Armond and Quentin.

100.

Mr. Chip did not attempt to explain the transfer process to Ms. Morris.

101.

Ms. Morris asked Mr. Chip if Mario and Armond were the only ones suspended.

102.

Ms. Morris also asked Mr. Chip to identify who her grandchildren were, reportedly, fighting.

103.

Mr. Chip responded, "This is what I got" and offered no further explanation.

104.

In November 2006, an AHS staff member, who Mario knows as Ms. Parks, called Mario out of his first period class and inspected his dress.

105.

Ms. Parks told Mario that he was in violation of the dress code because his belt was, reportedly, loose and he had a pick in his hair, again, suggesting that Mario was in a gang.

106.

At that time, Ms. Parks told Mario that his name is big around the school and had been brought up many times.

107.

Consequently, Ms. Parks sent Mario to ISS.

108.

ISS Coordinator, Russell Bennett, instructed Mario to locate the dress code violations that he, reportedly, violated.

109.

Mario did not violate the dress code.

110.

Nor could Mario locate any such violation, because it didn't exist.

111.

Ms. Morris received a call that Mario was sent to the Principal's office.

112.

Consequently, Ms. Morris went to AHS.

113.

When Ms. Morris arrived, she took Mario to Supervising Principal, Rob Brown, and asked him if he saw anything wrong with the way Mario was dressed.

114.

An NAACP representative, Edward Freeman, accompanied Ms. Morris to AHS and was present when she spoke to Mr. Brown.

115.

Mr. Brown answered no.

116.

Mr. Brown called Ms. Parks into his office, during which time she said she sent Mario to ISS because his belt strap was unloose and he had a comb in his hair.

117.

Ms. Morris told Mr. Brown and Ms. Parks that she was tired of the school singling Mario out.

118.

In addition, Ms. Morris said if staff would tell her what they expected of Mario, she would help and prevent him from getting pulled out of class.

119.

Mr. Brown called Mr. Chip into his office.

120.

Mr. Chip responded that he wasn't going over it again and walked out of Mr. Brown's office.

121.

Again, in December 2006, Mr. Chip called Mario into his office.

122.

When Mario arrived, an SRO, Mario identified as Deputy Fredenberg, was in Mr. Chip's office conversing with Mr. Chip.

123.

Mario overheard Deputy Fredenberg tell Mr. Chip, "We need to get him out of here as soon as possible."

124.

Mario entered Mr. Chip's office, at which time Mr. Chip told Mario to go back to class.

125.

Ms. Morris learned that Mario had been called into Mr. Chip's office and called Mr. Chip.

126.

Ms. Morris asked Mr. Chip if there were a problem with Mario and whether she needed to come to the school.

127.

Mr. Chip responded, "How did you know Mario was in my office."

128.

Ms. Morris asked again if everything was alright and if she needed to come to the school.

129.

Ms. Morris asked Mr. Chip if she could speak to Mario.

130.

Mr. Chip asked one of the staff personnel if Mario was sitting in the office and she responded that he (Mario) left.

131.

On December 15, 2006, through her counsel, Ms. Morris and Mario made a complaint to Mr. Remillard and the Board of Education, concerning the above incidents.

132.

Believing that the disciplinary actions taken against Mario were unfounded, Ms. Morris requested that the school expunge his disciplinary record.

133.

On January 19, 2007, Mario's cousin, Armond and another student, Alex Matthews, entered into a physical altercation.

134.

Alex Matthews was one of the boys that attempted to jump on Mario on October 31, 2006.

135.

Mario, Armond and Coach Justin Deshon went to Mr. Chip's office.

136.

Mr. Chip ordered Mario to go to his class.

137.

After Mario returned to his class, Mr. Alford had Mario to come to his office to fill out a report.

138.

Mr. Alford told Ms. Mario that they were going to walk to Mr. Chip's office so that Deputy Clark could verify his report.

139.

Mr. Chip instructed Mario to sit outside his office.

140.

As Mario sat outside Mr. Chip's office, Deputy Clark read the report.

141.

After Deputy Clark reviewed Mario's report, she informed him that she was going to charge him with obstruction charges because "you lied in your report."

142.

At that time, Mario asked Deputy Clark and Mr. Chip to call his grandmother.

143.

They would not call Ms. Morris, but instead, ordered Mario to sit outside Mr. Chip's office.

144.

After learning that Mario was, again, in Mr. Chip's office, Ms. Morris went to AHS and she and Mario were taken to Deputy Fredenberg's office.

145.

At that time, Deputy Clark entered Deputy Fredenberg's office.

146.

Ms. Morris stated that they would not have been in the situation if Mr. Chip and Deputy Clark had not falsely accused Mario of being in a gang.

147.

Deputy Clark responded, "He (Mario) is on the internet in a gang."

148.

Ms. Morris asked Deputy Clark to show her the picture of Mario, reportedly, in a gang.

149.

Deputy Clark said ok and walked out of Deputy Fredenberg's office and did not return.

150.

Ms. Morris walked over to Mr. Chip's office to see how her grandson, Armond, was doing.

151.

Deputy Clark came to Mr. Chip's office, without a picture of Mario in a gang.

152.

Ms. Morris told Mr. Chip that the boys would not have jumped on Quentin if he and Deputy Clark had not falsely accused Mario of being in a gang.

153.

Deputy Clark started yelling at Ms. Morris and told Ms. Morris to get out.

154.

Ms. Morris left.

155.

Mr. Chip suspended Mario.[2]

156.

Sometime after Ms. Morris and Mario arrived at their home, Ms. Morris received a call from AHS that her other grandchild, Quentin, had been jumped on.

---

[2]Ms. Morris and Mario intend to request a truancy panel hearing. Depending on the outcome of the hearing, Plaintiffs may amend their Complaint to add an additional count.

157.

Ms. Morris returned to the school; Mario and his cousin, Angelique Heard, accompanied her.[3]

158.

They entered Mr. Chip's office, at which time Mr. Chip told them to wait outside his office.

159.

While Ms. Morris, Mario and Angelique waited outside, Mario said to Chris Watson, "Ya'll jumped my cousin."

160.

At that time, Chris jumped up as if he was going to lunge at Mario.

161.

Ms. Morris stood between Chris and Mario.

162.

An unknown Douglas County Deputy, handcuffed Mario and Angelique.

163.

Deputy Fredenberg took Mario into his office and told him that he was charged with disorderly conduct and simple assault.

---

[3]Mario accompanied his grandmother back to the school because he feared her poor heart condition may be adversely affected from the pressure she was under.

164.

Deputy Fredenberg removed the handcuffs from Angelique's wrists.

165.

To Plaintiffs' knowledge, Chris Watson was not handcuffed, nor charged.

166.

Deputy Fredengerg released Mario to go home.

167.

Mr. Chip intercepted and told Deputy Fredenberg that they needed to hold Mario.

168.

At that time, Quentin's adult cousins arrived at the school to pick him up.

169.

They asked Mr. Chip questions about the events that had just occurred.

170.

Mr. Chip became aggravated, and instead of answering their questions, he said "get him out of here," referring to Mario.

171.

Mr. Chip stormed out of the office and slammed the door.

172.

Deputy Fredenberg removed the handcuffs from Mario's wrists.

173.

Mr. Chip suspended Mario for ten (10) days.

174.

Mario arrived home and received a threatening e-mail from Alex Matthews's brother, Andrea Carter.

175.

As a result, Ms. Morris called the Douglas County Sheriff's Department and reported the email.

176.

A Deputy Pierce went to Ms. Morris's home, reviewed the email and said that it wasn't threatening.

177.

Deputy Pierce instructed Ms. Morris to delete the email.

178.

On January 20, 2007, Plaintiff's counsel, received Douglas County Board of Education's response to their December 15, 2006 complaint.

179.

The Board concluded that Mario's "consequences for these infractions are consistent with the Douglas County Discipline Code."

180.

Prior to its decision, the Board did not hold a meeting with the Plaintiffs and their counsel.

181.

Neither did the board address the individual concerns that Plaintiffs outlined in their December complaint.

## FEDERAL CLAIMS

## COUNT ONE
## CONSPIRACY TO VIOLATE AND VIOLATION OF FOURTEENTH AMENDMENT, SUBSTANTIVE AND PROCEDURAL DUE PROCESS

182.

Plaintiffs incorporate by reference all the allegations contained in paragraph 1 through 180, as specifically plead therein.

183.

Defendants intentionally and falsely accused Mario of being in a gang, soliciting and participating in fights, for the purpose of ruining his reputation.

184.

Mr. Chip, Mr. Fountain and Deputy Clark created and maintained a hostile environment, further, to intimidate Mario and further ruin his reputation.

185.

Mr. Chip, Mr. Fountain and Deputy Clark's actions and/or inactions effectively ruined Mario's reputation by labeling him as a gang member, trouble maker and troubled kid, and caused him to incur disciplinary referrals, which resulted in the Douglas County Board of Education's erroneous and adversarial findings of Plaintiff's December 15, 2006 complaint.

186.

The above actions and inactions of Defendants deprived Mario of his substantive due process liberty rights.

187.

Mr. Chip, Mr. Fountain and Deputy Clark's actions and/or inactions were unjustified and of a harassing nature.

188.

Don Remillard and Douglas County Board of Education or Douglas County School System failed to provide Plaintiffs with a meaningful opportunity to prove the merit of their December 15, 2006 complaint in a fashion required by procedural due process and, therefore, deprived Mario of his liberty rights.

## COUNT TWO
## INTERFERENCE WITH AND CONSPIRACY TO INTERFERE WITH EQUAL PROTECTION

189.

Plaintiffs incorporate by reference all the allegations contained in paragraph 1 through 187, as specifically plead therein.

190.

Defendants selectively enforced the school discipline code by disciplining Mario more harshly than students similarly situated to him, whose conduct was offensive beyond that of Mario's.

191.

Defendants selectively enforced the school dress code by disciplining Mario more harshly than students similarly situated to him and for, reportedly, violating dress codes, that did not exist.

192.

Defendants' difference in treatment of Plaintiff compared to students similarly situated to him was irrational, arbitrary and capricious.

193.

Defendants' actions and/or inactions amounted to intentional and purposeful discrimination.

194.

At all times mentioned, Mr. Chip, Mr. Fountain and Deputy Clark, acting jointly and separately in the discharge of their duties and with the express authority of the Douglas County Board of Education or Douglas County School System, deprived Mario of equal protection of the laws.

195

The actions of the Defendants, as articulated above, deprived Mario of equal protection of the laws in violation of the Fourteenth (14th) Amendment to the United States Constitution and Constitution of the State of Georgia.

**COUNT THREE**
**FALSE ARREST-UNREASONABLE SEARCH**

196.

Plaintiffs reallege Paragraphs 1 through 195 and incorporate them herein by reference.

197.

Douglas County Board of Education or Douglas County School System caused Mario to be unlawfully arrested, handcuffed and shackled in the Douglas County Juvenile Courts in 2005.

198.

Mr. Chip, Mr. Fountain and Deputy Clark, while acting jointly and separately in the discharge of their duties and with the express authority of Douglas County Board of Education or Douglas County School System, did falsely and unlawfully cause Mario to be searched in September 2006, of which resulted in no fruit.

199.

Mr. Chip, Mr. Fountain and Deputy Clark, while acting jointly and separately in the discharge of their duties and with the express authority of Douglas County Board of Education or Douglas County School System, did falsely and unlawfully arrest or cause Mario and Angelique to be arrested without legal cause in January 2007.

200.

Mr. Chip, Mr. Fountain and Deputy Clark's actions deprived Mario and Angelique of their right to be secure in their person and to be free from unreasonable searches and seizures, as protected by the Fourth Amendment of the United States Constitution.

## COUNT FOUR
## PRIVILEGES OR IMMUNITIES

201.

Plaintiffs reallege Paragraphs 1 through 200 and incorporate them herein by reference.

202.

At all times mentioned, Mr. Chip, Mr. Fountain and Deputy Clark, acting jointly and separately in the discharge of their duties and with the express authority of Douglas County Board of Education or Douglas County School System, deprived Mario of his privileges and immunities available to all citizens.

203.

The actions of Mr. Chip, Mr. Fountain and Deputy Clark, as articulated above, were in violation of clearly established statutory or constitutional rights of which a reasonable official should have known.

204.

Mr. Chip knew or should have known that the actions of Mr. Fountain and Deputy Clark violated Mario's rights and failed to intervene and address the matter, and such failure amounted to a violation of Mario's civil rights.

205.

Mr. Remillard knew or should have known that the actions of Mr. Chip, Mr. Fountain and Deputy Clark violated Mario's rights and failed to intervene and address the matter, and such failure amounted to a violation of Mario's civil rights.

206.

Douglas County Board of Education or Douglas County School System was aware or should have been aware that Mr. Chip, Mr. Fountain and Deputy Clark's conduct violated Mario's rights, and was negligently, recklessly and deliberately indifferent in failing to discipline and/or control them, and that failure was the moving force for their malicious conduct.

207.

Douglas County Board of Education or Douglas County School System was the final decision maker for the policy (formally or informally promulgated), practice, custom or procedure Mr. Chip, Mr. Fountain Deputy Clark created and/or implemented, which was a factor for their malicious conduct.

208.

This policy (formally or informally promulgated), practice, custom or procedure was developed with negligent gross and deliberate indifference to the falsity exhibited by Mr. Chip, Mr. Fountain and Deputy Clark.

## STATE CLAIMS

## COUNT FIVE
## ASSAULT AND BATTERY

209.

Plaintiffs reallege Paragraphs 1 through 208 and incorporate them herein by reference.

210.

Mr. Chip, Mr. Fountain and Deputy Clark, acting in their official and individual capacities and in the discharge of their duties, did intentionally handcuff or cause Mario and Angelique to be handcuffed, with the intent to cause them physical and mental harm.

211.

Such touching was unwelcome and against Mario's will, causing injury to his wrist and mental injury.

## COUNT SIX
## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

212.

Plaintiffs reallege Paragraphs 1 through 211 and incorporate them herein by reference.

213.

The conduct of Defendants were intentional, reckless, extreme and outrageous and caused Ms. Morris and Mario, emotional distress, humiliation and ridicule

214.

Since the occurrences as outlined above, Ms. Morris and Mario have had to seek professional help for the stress that they've sustained as a result of Defendants' actions or inactions.

215.

As a result of Defendants' actions, Plaintiffs have been damages in a sum in excess of $100,000.00

WHEREFORE, Plaintiffs respectfully request the following:

a) Damages for pain and suffering in an amount to be proved at trial;

b) Compensation for damage to reputation in an amount to be proved at trial;

c) Compensation for medical expenses incurred as a result of Defendants' actions;

d) Punitive damages in an amount to be proved at trial for malicious acts of the Defendants;

e) Compensation for attorney fees in defending the above mention charges, and

f) For all other and further relief as the Court deems proper.

Submitted this 22nd day of January, 2007.

Lucinda Perry
Georgia Bar No. 402509
Attorney for Plaintiffs

6519 Spring Street, Ste. B
Douglasville, Georgia 30134
770-920-4744